UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

KAREN E. KISHBAUGH,

                    Plaintiff,

v.                                                    Case No.  5:07-cv-284-Oc-10GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                    Defendant.

_____/

## ORDER

        Plaintiff appeals from a final decision of the Commissioner of Social Security

("the Commissioner") denying her applications for a period of disability and disability

insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 5), and both

parties have filed briefs outlining their respective positions. (Docs. 12 and 13.)  For the

reasons discussed below, the Commissioner's decision is due to be **REVERSED** and

**REMANDED** under sentence four of 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

        On February 15, 2002, Plaintiff filed an application for a period of disability and

disability insurance benefits alleging a disability onset date of October 23, 2001. (R. 43-

45.)  Plaintiff's application was denied initially and upon reconsideration. (R. 36-37, 39-

40.)   Thereafter, Plaintiff timely pursued her administrative remedies available before

the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ")

which was held on May 12, 2004. (R. 352-362.)  A vocational expert (VE) appeared and

testified at the hearing.  (R. 431-435.)  The ALJ issued an unfavorable decision to

Plaintiff on August 5, 2004. (R. 10-22.)  Plaintiff's request for a review of the hearing

decision by the Social Security Administration's Office of Hearings and Appeals was

denied.  (R. 5-7.)

Plaintiff then filed a complaint in the Ocala Division of the Middle District of

Florida.[1]  This Court remanded the ALJ's decision to the Commissioner on July 28,

2005. (R. 404-406.)  On February 22, 2006, the ALJ held a supplemental hearing and

issued a second unfavorable decision on June 9, 2006.  (R. 566-604, 389-399.)  Plaintiff

requested a review of the ALJ's decision (R. 386-388), but on May 6, 2007, the Appeals

Council denied her request for review.  (R. 363-365.)  Plaintiff has now filed her

Complaint with this Court.  (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[2]  Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

---

[1]  Case No. 5:04-cv-685-Oc-10GRJ, Doc. 1.

[2]  See 42 U.S.C. § 405(g).

[3]  Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Commissioner's decision.[4]  The district court must view the evidence as a whole, taking

into account evidence favorable as well as unfavorable to the decision.[5] However, the

district court will reverse the Commissioner's decision on plenary review if the decision

applies incorrect law, or if the decision fails to provide the district court with sufficient

reasoning to determine that the Commissioner properly applied the law.[6]   The law

defines disability as the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment that can be expected to result in

death, or has lasted or can be expected to last for a continuous period of not less than

twelve months.[7]  The impairment must be severe, making Plaintiff unable to do her

previous work, or any other substantial gainful activity which exists in the national

economy.[8]

     The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a

claimant is working at a substantial gainful activity, she is not disabled.[10]  Second, if a

claimant does not have any impairment or combination of impairments which

---

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[12]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[13]  Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16]  The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

---

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (internal citations omitted).

[17] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work").

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

## III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was born in 1955 and was 51 years old at the time of the ALJ's final decision on June 9, 2006. (R. 43.) She has a high school equivalency education and has past relevant work experience as a cashier, office manager, price checker, video

---

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[19] Walker at 1003.

[20] Wolfe at 1077-78.

[21] See id.

[22] See Doughty at 1278 n.2.

rental clerk and hostess.  (R. 48, 53, 60.)  Plaintiff contends that she has been unable to

work since October 23, 2001 due to chronic neck and back pain from bulging discs in

the cervical and lumbar spine, hypertension, diabetes, and urinary frequency.  (R. 47.)

In his review of the record, the ALJ determined that Plaintiff had a severe

impairment of chronic neck and back pain from bulging discs in the cervical and lumbar

spine.  (R. 395.)  However, the ALJ determined that Plaintiff's depression, hypertension

and diabetes mellitus were not severe impairments.  (R. 395.)  The ALJ also determined

that Plaintiff did not have an impairment or combination of impairments which met or

medically equaled one of the impairments listed in Appendix 1, Subpart P of Social

Security Regulation No. 4.

The ALJ found that Plaintiff retained the RFC to perform light physical exertion,

including lifting and carrying 20 pounds occasionally and 10 pounds frequently; that she

can sit, stand and walk about six hours a day; that she can push and pull without

limitation, and can frequently balance, kneel, and crawl; and that she could occasionally

climb, stoop and crouch.  (R. 396.)  The ALJ determined Plaintiff could perform her past

relevant work as a cashier, office manager, price checker, video rental clerk and

hostess as generally performed in the national economy and concluded that Plaintiff

was not disabled.  (R. 398.)

The record shows that Plaintiff has a history of neck and back pain following two

motor vehicle accidents.  (R. 98, 100, 320, 326.)  The first motor vehicle accident

occurred on April 14, 2000 and later that day Plaintiff had an x-ray of the cervical spine

which noted minimal spondylosis that was worse at C6-7.  (R. 98, 100, 118.)  Dr. Lowell,

an orthopaedist, treated Plaintiff and noted that the range of motion in her neck was stiff

and slow, but that she had normal flexion, extension and left/right rotation.  (R. 100-101.)  Additionally, he noted mild tenderness in the lumbosacral junction.  (R. 101.)  Dr. Lowell reviewed the x-rays and noted some moderate degenerative changes but no other abnormalities. (Id.)  His diagnosed a lumbar and cervical strain. (Id.)

On May 23, 2000, Plaintiff sought treatment from Oregon Hunter, M.D.  (R. 145-148.)  Dr. Hunter noted that Plaintiff had marked decreased range of motion in all planes of her cervical spine and that she had decreased flexion (greater than extension) in her lumbar spine.  (R. 147.)  He diagnosed a cervical and lumbosacral sprain secondary to the motor vehicle accident. (Id.)  Dr. Hunter recommended x-rays and an MRI and restricted Plaintiff's lifting, reaching, pulling, pushing and standing or bending. (Id.)

On May 31, 2000, Plaintiff underwent an MRI of her cervical spine.  (R. 144.)  The MRI, as read by Dr. Sheldon Katanick, noted a "straightening of her cervical spine with midline herniations at C4-5, C5-6 and C6-7 causing impingement on the anterior spinal canal." (R. 144.)

In June of 2000, Plaintiff returned to Dr. Hunter and complained of neck and back pain.  (R. 142.)  During a physical exam, Dr. Hunter noted a severe limitation in rotation and side bending and mild lumbar rigidity. (Id.)  After reviewing the MRI and x-ray findings, Dr. Hunter noted that Plaintiff's condition was high in complexity with multiple diagnostic options; high complications and continued severe prolonged functional impairment.  (R. 143.)

In July of 2000, Plaintiff had continued significant limitation in her cervical range of motion but had some improvements.  (R. 141.)  She still continued to be limited in

7

reaching, pulling, pushing, or prolonged static neck positions and lifting more than 15 pounds occasionally.  (Id.)  Although she did not exhibit pain behavior, she continued to report neck, mid-back and low-back pain.  (Id.)

On August 30, 2000, Plaintiff underwent an x-ray of her lumbar spine which demonstrated early to moderate degenerative changes.  (R. 138.)  A week later, Plaintiff had an MRI of the lumbar spine, which noted mild disc protrusions at L3-L4 and to a lesser extent, at L2-L3.  At  L4-5, there was mild anterior disc protrusion.  (R. 137.)  Although there were disk protrusions, there was no evidence of herniation or encroachment on the canal or foramina.  (Id.)  Additionally, Plaintiff had some fluid collection at L4 and near the paraspinal muscle, which was determined to be insignificant.  (Id.)

On September 19, 2000, Plaintiff reported that with restrictions on activity she experienced less severe and intermittent neck and back pain.  (R. 135.)  Dr. Hunter completed an activity level estimation on September 22, 2000 and concluded that Plaintiff could return to activities with restrictions that limited her to lifting/carrying up to 10 pounds occasionally and additional limitations of no pushing, pulling or reaching.  (R. 134.)

Plaintiff began physical therapy in June of 2000.  (R. 110-114.)  During the course of therapy, she complained of pain but did make progress, increasing her strength and decreasing her pain.  (R. 110-112.)  After completing physical therapy, Dr. Hunter noted that Plaintiff continued to have pain in her neck and back and that the pain was radiating down the spine.  (R. 132.)  Plaintiff had a decreased ability to lift and endurance for household chores.  (Id.)  Although not in acute distress, Plaintiff exhibited

mild pain behavior with rigidity in the right neck which was greater than in the low back. (Id.)  Accordingly, Dr. Hunter recommended a functional capacity evaluation to set restrictions.  (R. 131.)

On December 12, 2000, Plaintiff underwent the functional capacity evaluation with Bruce A. Mueller, OTR, LCHT.  (R. 129.)  The functional capacity evaluation notes that she could use her upper extremities to lift three pounds constantly, seven pounds frequently, and ten pounds occasionally. (Id.)  Further, Mr. Mueller noted that Plaintiff should never perform bending, squatting or climbing; that she could only occasionally stand, walk, reach, kneel, and crawl; and that she could frequently sit. (Id.)

Plaintiff then developed new symptoms of numbness in her left arm and leg as well as a decreased ability to tolerate sitting, standing and walking.  (R. 127.)  Dr. Hunter determined that the functional capacity evaluation, which limited Plaintiff to four hours per day of "sedentary," was "valid." (Id.)

In an effort to rule out radiculopathy, Plaintiff underwent an electromyogram and nerve conduction study on December 22, 2000, on the left upper and lower extremities. (R. 125-126.)  Although the results were essentially normal there were, however, mild neuropathic changes in the left vastus lateralis suggesting left L4 nerve root involvement.  (R. 124.)

Dr. Hunter diagnosed Plaintiff with a cervical strain with C4-5, C 5-6 and C6-7 disc protrusions as well as a lumbosacral strain with L4-5 protrusion.  (R. 115.)  On February 6, 2001, Dr. Hunter completed a permanent impairment rating and noted that Plaintiff was only able to function at the part-time sedentary level, which prevented her from returning to active employment.  (R.  119.)  In making this determination, Dr.

9

Hunter referred to Plaintiff's complaints of pain, the x-rays of the cervical, lumbar and thoracic spine, MRI's of the cervical and lumbar spine and the EMG and nerve conduction studies.  (R. 118.)  Dr. Hunter noted that Plaintiff was predominately using over the counter medications, but also used Zanaflex when spasms were intense.  (R. 117.)

Intermittently, from February 28, 2002 through November of 2003, Plaintiff received psychiatric treatment with Dr. Timothy Byrd for depression related to her physical impairments.  (R. 158-162, 243-246.)  The medical records generally disclose effective management of her depression.(Id.)

On August 2, 2002, Plaintiff underwent a one-time consultative examination by Edward L. Demmi, M.D.  (R. 181-185.)  Dr. Demmi notes that her walk was indicative of someone who changes her gait to avoid pain, but states that she could walk unassisted. (R. 184.)  He also notes that Plaintiff had a decreased range of motion in the shoulders and cervical and thoracolumbar spine but that her motor, sensory and reflex findings were normal.  (Id.)  Dr. Demmi recorded mild paravertebral muscle spasms in the lumbar spine, a normal grip strength and no motor deficits in her upper or lower extremities.  (Id.)

In March of 2002, Plaintiff began her medical care with Dr. Charles Grudem. (R. 241.)  In his initial evaluation, Dr. Grudem noted paraspinal irritability with trigger points at C3-4 and inhibited bicep and tricep functioning, as well as, a reduced cervical and forward flexion, right rotation (by 30%), and left rotation (by 50% with pain).  (R. 239-240.)  In March and April she presented with back pain and difficulty with prolonged sitting or standing and a limited ability to lift.  (R. 236, 238.)

10

In his June 17, 2002, "physical capacities evaluation," Dr. Grudem opined that Plaintiff could seldom lift/carry up to 5 pounds; could seldom push or pull over 10 pounds while seated, she could never push or pull when standing, and could never bend, squat, crawl, climb or reach over shoulder level.  (R. 155.)  Dr. Grudem also found that Plaintiff would able to sit or stand for only two hours and alternate between sitting and standing for one or two hours. (Id.)  Plaintiff was unable to use her feet for repetitive movements, such as, operating foot controls. (Id.)  Finally, Dr. Grudem stated that Plaintiff was unable to be at protected heights, and had mild to moderate restrictions in being exposed to temperature/humidity, exposure to dust, fumes and gases, and in driving automotive equipment. (Id.)

Additionally, Dr. Grudem noted that Plaintiff had moderate to severe pain and stated that her pain would affect her ability to concentrate in a work-like setting. (Id.)  In his records, Dr. Grudem notes that Plaintiff had "...definite significant disc pathology in both neck and low back with multiple disc bulges and herniations for each area."  (R. 157.)  On July 22, 2004, Dr. Grudem reported spinal cord compression at C5-6 and low back pain. (R. 497.)  On August 9, 2004, Dr. Grudem noted that Plaintiff was unable to perform any type of job that would require her to be at work on a regular basis.  (R. 496.)

Dr. Grudem continued his treatment of Plaintiff in September of 2002. During this period of time she complained of back pain and neck pain with stiffness as well as tightness in her hands and fingers.  (R. 227.)  In December of 2002, Dr. Grudem observed "obvious paravertebral spasms" and a stiff gait with little pelvic movement.  (R. 221.)  Additionally, he noted a "marked blood flow loss to both arms if hands are

11

overhead, even briefly. (Id.)  Dr. Grudem stated that this blood flow loss prevented

Plaintiff from working at or over shoulder level and that she became "visibly flushed"

with the examination. (Id.)  However, an upper extremity arterial ultrasound had no

findings which suggested thoracic outlet syndrome. (R. 149.)  Dr. Grudem questioned

this result and observed that  thoracic outlet syndrome is present despite the "false

negative" (R. 149, 157.)

In January, March, May, June, August and October of 2003, Dr. Grudem

continued to treat Plaintiff for chronic neck and back pain and tingling in her extremities.

(R. 329, 331, 336, 344.)  Although Plaintiff had been walking about 20 minutes a day

and at times was "not doing too badly," Dr. Grudem noted a "definite progression of

symptoms."  (R. 216, 329.)

On October 22, 2003, Plaintiff was involved in a second automobile accident.  (R.

320-326.)  Since that second accident, Plaintiff has experienced an increase in pain. (R.

324.)  She underwent an x-ray at Munroe Regional Medical Center which showed a loss

of normal cervical lordosis and degenerative changes in the lower cervical spine but no

acute fracture or dislocation was seen.  (R. 326.)

From the months of October 2003 through March of 2004, Plaintiff continued to

receive treatment from Dr. Grudem for exacerbated neck, mid and low back pain as a

result of the car accident.  (R. 310, 314, 318.)  Plaintiff then presented with new

symptoms of pain in the back of the legs, arms and feet.  (R. 310, 318.)  In a neurologic

examination of her upper extremities, Dr. Grudem noted that the brachioradialus reflex

was difficult to find and required upper extremity pronation to discern it. (R. 319.)

During that examination, he noted that Plaintiff's cervical spine was diffusely tender from

C3-7 with an increased tone in the paraspinals.  (Id.)  Plaintiff's range of motion was markedly decreased; she had multiple pain trigger points and markedly increased paraspinal tones from L1-S1. (Id.)  Because she began to experience sleep disturbances, Plaintiff's medication was increased. (Id.)

Because Plaintiff was experiencing memory problems Dr. Grudem referred her to a neurologist for evaluation.  (R. 341, 342.)  The MRI of the brain showed "mild generalized atrophy," and according to Dr. Grudem, this most likely was related to a type of brain disorder although Plaintiff's diabetes and hypertension may have had an accelerated aging effect.  (R. 295, 248.)

Due to a progression of symptoms, Dr. Grudem recommended that updated MRI evaluations be performed.  (R. 296.)  On May 5, 2004, Plaintiff underwent MRI examinations of her cervical, thoracic and lumbar spine.  (R. 290-292.)  The MRI revealed that at C3-4, there was a tiny disc protrusion slightly into the space, at C5-6 there was a lobulated disc osteophyte and the ventral cord appeared contoured, as well as, mild neural forminal narrowing.  (R. 290.)  Compared to her prior MRI of December 2002, there was a slight progression with asymmetry in the right paracentral location. (Id.)  At C6-7, there was a moderate disc osteophyte complex which flattened the ventral thecal sac and contoured Plaintiff's spinal cord. (R. 291.)  The impression of the cervical spine was a mild progression of the degenerative changes to the right at C5-6, without acute focal disc extrusion or central canal stenosis. (Id.)  The MRI of the thoracic spine revealed a stable thoracic spine within normal limits, with no acute abnormality of canal stenosis. (Id.)

The MRI of the lumbar spine demonstrated a mild disc bulge at L5-S1 without canal stenosis which has remained stable.  (R. 292.)  At L4-5, there was a moderate disc bulge with a new protrusion having mass effect on left L4 nerve root, as well as, the L5 nerve root.  (Id.) At L3-4, there was a mild disc bulge extending without stenosis and degenerative disc disease at L4-L5.  (R. 324.)

On April 5, 2004, Plaintiff had x-rays of the lumbar and thoracic spine.  (R. 522, 523.)  X-rays of the lumbar spine revealed mild to moderate spondylolisthesis and the views of the thoracic spine revealed diffuse thoracic degenerative spondylosis.  (R. 523.)

On June 28, 2005, Dr. Grudem provided a narrative report noting that he has treated the Plaintiff after both her first and second motor vehicle accidents and that she presented as somewhat of a complicated case. (R. 271.)  Dr. Grudem reported that Plaintiff's "...condition warrants surgery but that she was not amenable to that right now in an overall sense.  Given the number of other issues she has, including the mild brain injury with it's tendency to cause confusion, I think that is a reasonable position on her part."  (R. 472.)  He further noted that, "when she needs spine surgery, there will be a major challenge with how many levels [there are] to operate upon because she has so many areas of abnormality and it would not be in her best interest to do a poor partial job on her spine since the overall results tend to be rather poor." (Id.)  Dr. Grudem found that Plaintiff's physical limitations were "marked" and noted that she should not sit or stand for any length of time beyond 10 to 15 minutes and she must not lift more than 5-10 pounds at any time or at most 15 pounds on a very rare occasion. (Id.)  According to Dr. Grudem, Plaintiff cannot tolerate being upright long enough to work on a regular

14

schedule. (Id.)  Dr. Grudem further opined that whatever functional capacity may have been present prior to October 2003, was lost as a result of the 2003 accident with the exception of Plaintiff's activities of daily living which must be done at a very low pace in a limited fashion. (Id.)

The January 12, 2006 notes from Dr. Grudem disclose that Plaintiff continued to have neck pain due to multi-level cord compression. (R. 529.)  In February of 2006, Dr. Grudem noted that Plaintiff's neck and back pain had increased, and that the pain and tingling had increased in her bilateral lower extremities with stiffness in both of her hands.  (R. 525.)

On August 23, 2002, a state agency non examining physician evaluated Plaintiff's records and determined that Plaintiff occasionally could lift twenty pounds, frequently lift ten pounds, stand and walk six hours, sit six hours and occasionally climb, stoop and crouch, and frequently balance, kneel, and crawl, with no limitations in pushing and pulling.  (R. 187-193.)  The physician noted Plaintiff's complaints of pain, her marked decreased range of motion, a mild antalgic gait, mild muscle spasms and lumbar and cervical spine disc protrusion per x-rays. (R. 187.)  Additionally, the physician found that her pain in the cervical and lumbar spine and radiation was attributable to a medically determinable impairment of disc protrusions. (R. 191.)  Finally, the physician found that Plaintiff could walk unassisted for 20 to 30 minutes, that she had no motor, sensory, reflex deficit and good motor strength.  (R. 192.)

On January 6, 2003, a second state agency non-examining physician evaluated Plaintiff's records and completed a physical residual functional capacity assessment. (R. 209-214.)  The physician found that Plaintiff occasionally could lift twenty pounds,

frequently lift ten pounds, stand and walk six hours, sit six hours and occasionally climb, stoop, and crouch, balance, kneel, and crawl but had limitations in reaching and working around hazards. (Id.) The physician noted a mild limp, but stated that Plaintiff did not require the help of an assistive device.  (R. 210.) According to the physician, Plaintiff's cervical spine had a herniated nucleus pulposus with a decreased range of motion. (Id.) The examiner also noted that Plaintiff's straight leg raising was negative, she had a disk bulge at L1, tenderness upon palpation of the lumbar spine with increased pain with a decreased range of motion.  (R. 209.)  The examiner noted that Plaintiff's right extremity was okay and questioned whether she had thoracic outlet syndrome. (Id.)

Plaintiff testified on her own behalf at both evidentiary hearings.  (R. 352-362, 566-604.)  Through occupational therapy, Plaintiff is able to dress and bathe herself, and she has been taught to do things in a certain way to compensate for pain.  (R. 589.) However, there are times where she sits for a little while before finishing the task.  (R. 588-589.)  Plaintiff also uses these occupational therapy techniques, such as taking extra time and getting on her hands and knees, to make the bed in the morning.  (R. 591-592.)

Plaintiff is able to feed her cat and make simple meals for herself, such as, heating up left-overs or having a bowl of cereal.  (R. 594. Plaintiff can make a meal for herself and her husband, if the meal requires quick preparation,  (Id.)  She has purchased a robotic vacuum to help with vacuuming and can do "small" loads of laundry.  (R. 595.)  Although Plaintiff drives occasionally, mostly for doctor appointments, she describes this as "hard" because she has to be very careful and take her time.  (R. 593.)

16

Plaintiff testified that she is unable to lift her arms all the way and when she does she has pain in her shoulder, neck, and back.  (R. 580.)  Because of the pain she is unable to lift a gallon of milk.  (R. 584.)  Her mid and lower back pain is constant, although pain medicine does help.  (R. 582.)  Plaintiff's medications include: Percocet (taken three times per day), Darvocet (alternating between the Percocet), Celebrex (twice a day), Nortriptyline, a muscle relaxer (three times a day) and Imitrex.  (R. 590.)  She reports that she can sit and stand 20 to 30 minutes at a time, but does have tingling and pain in her feet and experiences pain and numbness throughout her left leg.  (R. 587.)  Plaintiff reports that she has a memory problem, which includes short term memory loss.  (R. 589-599.)

## IV.  DISCUSSION

Plaintiff raises three issues. First, Plaintiff argues that the ALJ erred by failing to explain properly or to provide "good cause" for the weight that he gave to the opinions of Drs. Grudem and Hunter, both of whom were treating physicians. Secondly, Plaintiff argues that the ALJ erred by failing to obtain testimony from a vocational expert with regard to the requirements of the Plaintiff's past relevant work and by failing to make findings as to the physical and mental demands of the Plaintiff's past relevant work. Lastly, Plaintiff argues that the ALJ erred in finding that Plaintiff's subjective complaints were not credible and that the ALJ's finding that Plaintiff retains the residual functional capacity to perform light work is not supported by substantial evidence. Because the Court concludes that the ALJ improperly rejected the opinions of Drs. Grudem and Hunter, the treating physicians, the Court will address this issue first.

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[23]   The opinion of a treating physician may be discounted, however, where the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence of record supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.[24]  Further, where the claimant's own testimony regarding her daily activities contradicts the opinion of a treating physician, an ALJ need not give the treating physician's opinion considerable weight.[25]  If the treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[26]  A treating physician's opinion is, of course, generally entitled to more weight than the opinion of a consulting physician.[27]

Turning first to the opinions of Dr. Grudem, the ALJ concluded in his first decision on August 5, 2004, that "Dr. Grudem's comments regarding the extent of functional limitation in this case stand in stark contrast to other examining and attending

---

[23] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[24] Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

[25] Id.

[26] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

[27] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

18

physicians and are decidedly not well-supported regardless of his titular background."
The ALJ concluded that:

> In this case there is ample "good cause" not to accept Dr. Grudem's
> opinion as to severity and degree of functional limitation.  It is contrary to
> the lack of relatively minor clinical findings reported by numerous other
> treating and examining physicians and is not supported by his own clinical
> findings although they are much more detailed than those of any other
> physician.  Dr. Grudem's reported impairments are not supported by any
> of these [medically  acceptable clinical and laboratory diagnostic
> techniques] and are contrary to much of the testing that has been done.

In the most recent decision, dated June 9, 2006 the ALJ stated that  "While the

opinions of Drs. Grudem and Hunter (incorporating Mr. Muellers' physical capacity

evaluation) are due appropriate consideration based on their treating relationship, there

appears to be no substantive correlation between the claimant's daily activities and their

reported findings." Lastly, the ALJ found in the June 9, 2006 decision that "the opinion of

Dr. Grudem that the claimant is 'permanently and totally disabled,' is a determination

reserved to the Commissioner."

Thus, the ALJ accorded less weight to the opinion of Dr. Grudem because: (1)

Dr. Grudem's findings were contrary to the Plaintiff's activities of daily living, and (2) Dr.

Grudem's opinions of functional impairment were not supported by any clinical or

diagnostic testing and were contrary to the opinions of other physicians.  The problem

with the ALJ's proffered reasons for rejecting Dr. Grudem's opinions is that his opinions

were based upon clinical and diagnostic testing and were only contrary to the opinions

of the non-examining state agency physicians. Moreover, the ALJ's conclusion that Dr.

Grudems' findings are contrary to Plaintiff's activities of daily living is not based upon

substantial evidence but rather a mischaracterization of the evidence of record.

19

Dr. Grudem had an extensive and ongoing treating relationship with Plaintiff which spanned a period of at least four years and included monthly examinations with clinical and laboratory findings.  (R. 155-157, 216-242, 290-351, 469-473, 493-565.)  Dr. Grudem diagnosed Plaintiff with "definite significant disc pathology in both neck and low back with multiple disc bulges herniations in each area."  (R. 157.)  He further opined that Plaintiff is unable to perform any type of job that would require her to be at work on a regular basis. (R.  496.) Contrary to the statement by the ALJ these conclusions were based upon clinical examination and diagnostic testing.

For example, during examination, Dr. Grudem found that Plaintiff had paraspinal irritabiilty with trigger points at C3-4, inhibted bicep and tricep functioning, and reduced cervical and forward flexion, "obvious paravertebral spasms" and a stiff gait with little pelvic movement.  (R. 221, 239-240.)  During a neurologic examination of her upper extremities, Dr. Grudem observed that Plaintiff's  brachioradialus reflex was difficult to find and required upper extremity pronation to discern it (R. 319), the cervical spine was diffusely tender from C3-7 with an increase tone in the paraspinals with a markedly decreased range of motion with multiple pain trigger points, as well as, markedly increased paraspinal tones from L1-S1.  (Id.)

Notably, over the course of four years of treatment, Dr. Grudem consistently noted Plaintiff's reports of chronic neck and back pain, as well as, tingling in her extremities (R. 227, 331, 336, 344, 525, 529), difficulty with prolonged sitting or standing and a limited ability to lift (R. 236, 238), tightness in her hands and all fingers (R. 227), exacerbated neck, mid and low back pain (R. 310, 314, 318), pain in the back of the legs, arms and feet.  (R. 310, 318.)  Dr. Grudem considered the pain of sufficient

significance that he referred Plaintiff for psychiatric treatment as a result of depression she was experiencing from the pain.  (R. 158-162, 243-246.)

In addition to the diagnoses reached by Dr. Grudem from his examinations - and contrary to the statement by the ALJ that Dr. Grudem's opinions were not supported by clinical testing - Dr. Grudem  referred Plaintiff for MRI evaluations because of Plaintiff's "definite progression of symptoms."  The MRI revealed that Plaintiff had a disc protrusion slightly into the space, at C5-6, a lobulated disc osteophyte with a contouring of the ventral cord with mild neural forminal narrowing (R. 290), and at C6-7, a moderate disc osteophyte complex which flattened the ventral thecal sac contouring the cord.  (R. 291.)

The MRI of the lumbar spine showed a mild disc bulge at L5-S1 without canal stenosis (R. 292), a moderate disc bulge with a new protrusion having mass effect on Plaintiff's left L4 and L5 nerve root (R. 292), and a mild disc bulge extending without stenosis at L3-4.  (Id.)  The MRI of the lumbar spine showed degenerative disc disease at L4-L5.  (R. 324.)  X-rays of the lumbar, thoracic, and cervical spine (R. 623, 326) revealed mild to moderate spondylolisthesis in the lumbar spine, diffuse thoracic degenerative spondylosis in the thoracic spine (R. 523), and loss of normal cervical lordosis and degenerative changes in the lower cervical spine.  (R. 326.)  Thus, Dr. Grudem reviewed and had the benefit of these MRI results as part of his examination and diagnosis of the Plaintiff.  Accordingly, the ALJ's statement that Dr. Grudem's opinions were not based upon clinical and diagnostic testing is inaccurate. And to the extent that the ALJ relied upon the MRI results as a reason for rejecting the opinion of

Dr. Grudem, the ALJ failed to explain how these MRI results were inconsistent with Dr. Grudem's opinion.

Rather than relying upon the opinions of Plaintiff's treating physician, the ALJ relied upon the opinion of the non-examining state agency physicians. The problem with the ALJ's reliance upon the opinions of the non-examining state agency physicians, is that neither state agency physician had the benefit of all of the medical records, through March of 2006, including the 2004 MRI and x-rays when they rendered their opinions in 2002 and 2003.  Accordingly, their conclusions regarding Plaintiff's residual functional capacity were formed without the benefit of the diagnostic testing, which Dr. Grudem had reviewed.

Lastly, the ALJ's statement that Dr. Grudem's findings are contrary to Plaintiff's activities of daily living mischaracterizes the record. In particular the ALJ noted that the opinions of the state agency physicians were more consistent with the claimant's reported activities of daily living, including doing household chores, and vacationing at Walt Disney World.  (R. 186, 208, 397.) The ALJ noted that Plaintiff is able to perform light housework, prepares meals for herself and her spouse, drives to the store, and does grocery shopping with some assistance, washes clothes and goes on day-long trips to theme parks.  (R.  397.) In rejecting Plaintiff's claims of incapacitating pain, significant drowsiness and lack of alertness, the ALJ pointed to Plaintiff's "day-long trips to theme parks." (Id.)  The only evidence in the record of "day-long trips to theme parks" is a one-time day trip to Walt Disney World which took place approximately two years before the supplemental hearing.  (R. 542.)  The ALJ failed to mention that during this trip Plaintiff testified she used pacing for activities, avoided all jarring rides and had

frequent rest periods. (Id.)  Notably, Plaintiff testified that after this one-time trip, she had increased pain and although she was alternating pain medications, muscle relaxants and anti-inflammatory medication, Plaintiff was still unable return to her prior baseline of pain control.  (Id.)

While the record does contain evidence that with the help of occupational therapy, taking rest breaks, and getting on her hands and knees, Plaintiff is able to dress and bathe herself, and make her bed, feed her cat, make simple meals, wash small loads of laundry and with care is able to drive to her doctor appointments (R. 588-589, 591-594), Plaintiff's participation in these everyday activities of short duration, including a one day trip to Walt Disney World (four years ago), do not constitute substantial evidence to disqualify Plaintiff from disability nor are they inconsistent with the limitations recommended by Plaintiff's physicians.[28]

Accordingly, for all of these reasons, the Court concludes that the ALJ erred in failing to provide considerable weight to the opinions of Dr. Grudem with regard to Plaintiff's functional limitations.

The same is true with regard to the ALJ's decision to accord less weight to the opinion of  Dr. Hunter, a treating physician. Like Dr. Grudem,  Dr. Hunter's opinions were based upon objective diagnostic and clinical findings.

For example, on February 6, 2001, Dr. Hunter completed a permanent impairment rating and noted that Plaintiff was only able to function at the part-time sedentary level, which prevented her from returning to active employment.  (R.  119.)

---

[28] Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997.) (Holding that claimant's participation in everyday activities of short duration, such as housework or fishing, does not disqualify a claimant from disability or is inconsistent with the limitations recommended by a treating physician).

Dr. Hunter diagnosed Plaintiff as having a cervical strain with C4-5, C 5-6 and C6-7 disc protrusions, as well as, a lumbosacral strain with L4-5 protrusion.  (R. 115.)  An x-ray of the lumbar spine showed early to moderate degenerative changes and an MRI of the lumbar spine noted mild disc protrusions at L3-L4 and at L2-L3.  (R. 137-138.)   An electromyogram and nerve conduction study on the left upper and lower extremities noted mild neuropathic changes in the left vastus lateralis suggesting left L4 nerve root involvement.  (R. 124.)  Dr. Hunter noted that Plaintiff's condition was high in complexity with multiple diagnostic options; high complications and continued severe prolonged functional impairment. (R. 143.)  In making this determination, Dr. Hunter relied upon not only Plaintiff's complaints of pain but upon the x-rays of Plaintiff's cervical, lumbar and thoracic spine, MRI's of the cervical and lumbar spine and the electromyogram and nerve conduction studies.  (R. 118, 126, 131, 137-138, 144.)  As such, contrary to the statement of the ALJ, Dr. Hunter's opinions regarding Plaintiff's functional limitations were based upon and fully supported by objective diagnostic and clinical findings.

Accordingly, the Court concludes that the ALJ's determination to accord less weight to the opinions of Drs. Grudem and Hunter - both of whom were treating physicians - was not supported by substantial evidence and therefore was error. For these reasons, this case is due to be remanded to the Commissioner so that the ALJ can conduct a further evaluation of Plaintiff's residual functional capacity after according substantial or considerable weight to the opinions of Dr. Grudem and Dr. Hunter.[29]

_____

[29] Because this case is being reversed and remanded for the ALJ to conduct a new RFC analysis, Plaintiff's additional arguments that the ALJ erred by rejecting Plaintiff's credibility and concluding that Plaintiff retained the RFC for light work need not be addressed because these issues are dependent upon the new RFC evaluation. Further, the Court need not address Plaintiff's argument that the ALJ erred by
(continued...)

## V.  **CONCLUSION**

In view of the foregoing, the decision of the Commissioner is due to be

**REVERSED and REMANDED** under sentence four of 42 U.S.C. § 405(g) to the

Commissioner, for an Administrative Law Judge to re-evaluate Plaintiff's RFC after

according appropriate weight to the opinions of Drs. Grudem and Hunter and to conduct

any additional proceedings the Commissioner deems appropriate. The Clerk is directed

to enter final judgment in favor of the Plaintiff consistent with this Order and to close the

file.

 **IT IS SO ORDERED.**

 **DONE AND ORDERED** in Ocala, Florida, on September 5, 2008.

_Gary R. Jones_
_____
GARY R. JONES
United States Magistrate Judge

Copies to:
 Counsel of Record

---

[29](...continued)
failing to procure VE testimony regarding Plaintiff's past relevant work because the ALJ will be required on remand after determining Plaintiff's RFC to address whether Plaintiff can perform her past relevant work. During this step of the sequential evaluation the ALJ will be required to consider the physical and mental demands of Plaintiff's past relevant work.